## HAMBURG-AMERICAN PACKET CO. v. RICH.

(Circuit Court of Appeals, Third Circuit. February 13, 1908.)

No. 44.

1. COLLISION—STEAMER AND ANCHORED BARGE—NEGLIGENT NAVIGATION.
    A finding of the trial court that a collision between a steamship starting down the Delaware river and a barge anchored within the anchorage grounds at Philadelphia was due to the fault of the steamship, and that the barge was not in fault, affirmed.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 101.]

2. SAME—SUIT FOR COLLISION—DEFENSE—PLEADING.
    In a suit in personam against the owners of a vessel for collision, the defense that the vessel was being navigated by a licensed pilot, whose taking was compulsory under the law, cannot be availed of, unless pleaded in the answer with due certainty and precision.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 154 Fed. 1006.

N. Dubois Miller and J. Wilson Leakin, for appellant.
John F. Lewis, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the District Court for the Eastern District of Pennsylvania. The case was a libel in personam, by the master of the barge "Iron State," on behalf of its owners and the owners of the cargo, against the Hamburg-American Packet Company, owners of the steamship "Bengalia," to recover for the loss of the barge and her cargo, caused by a collision with the said steamship while the barge was lying at anchor on the eastern side of the Delaware river, above Gloucester, in or near the port of Philadelphia, and as alleged within the limits of an anchorage ground for that port. The steamship was of steel, 500 feet in length, 62 feet beam, had on board 5,000 tons of cargo, and was bound down the river to sea, drawing 23 feet of water. The barge "Iron State" was a wooden vessel 214 feet long, of 1,700 tons capacity, engaged in the coal carrying trade. At the time of the collision, she had a full cargo of coal on board, and was anchored on the western side of the said anchorage

ground, where she had been two or three days, waiting for a tug to tow her on her voyage to some eastern port.

The steamship left her pier about half past 5 o'clock in the morning, and proceeded down the river, with her master and pilot and a third officer and quartermaster on the bridge, and other officers and members of the crew on the deck. The tide was ebb, running about 3½ or 4 miles an hour, and the barge was tailing to her anchor, with her head upstream. The collision occurred about 6 o'clock in the morning, and those on board the ship testified that; though it was daylight and clear enough when the steamship left its pier, shortly after the atmosphere became hazy, and just before the collision thickened into a fog, which came down around those on the bridge of the steamship, so as to prevent their seeing the barge they were approaching. The usual mast light on the barge was still burning, though it was daylight, but there was no watch on deck. As the barge was at anchor and the steamship was the moving cause of the collision, the court below correctly held that she was presumptively at fault, and that the burden was upon the respondents to rebut that presumption. This, they have attempted to do by the testimony of her officers and crew above referred to, to the effect that a thick fog settled down on the steamship just before the collision, that their fog signals were thereupon at once sounded and the ship slowed down, that there were no signals from the barge, and that at just about that time, a ferryboat met them, in order to pass which the helm was starboarded, which gave the vessel a sheer to port and towards the anchorage ground, and that directly after the barge was sighted, 200 or 300 feet ahead, and that orders were given to port the helm and reverse the engine, but that, owing to the short distance between the steamship and the barge, when the latter was discovered, the port sheer was not overcome by the porting of the helm, or her headway sufficiently slackened by the reversing of the engine to prevent the collision, and that there was no negligence on the part of those in charge of the steamship. The steamship, therefore, struck the barge upon its port side, about 40 feet from the bow and at an angle of about 45 degrees, causing it to drag its anchor and move down with the steamship against another barge anchored below it, the collision with which caused the almost instant sinking of the former. The respondents also aver that the collision was due to the negligence of those on board the barge, in maintaining no anchor watch and sounding no signals; that if there had been a proper anchor watch, the cable of the barge could have been paid out as the steamer approached, which would either have avoided the collision altogether, or diminished its violence, and moreover, that the barge was on the extreme western side of the anchorage ground, or outside of it in the channel way of the river.

The court below, however, found that the barge was well within the limits of the anchorage ground, and that the custom of vessels lying within said ground was not to maintain an anchor watch. The testimony as to atmospheric conditions, and as to the sounding of the fog signal, was more than usually conflicting. The court below, however, has found that, by the preponderance of testimony, it was established to its satisfaction that there was no such fog as that testified to by those

on board the steamship, and that the tesimony, presumably unbiased, of those on other vessels on the anchorage ground, and on the passing ferryboat, negatived the existence of such a fog, and established the fact that, at the time of and just before the collision, objects could have been seen at a sufficient distance by those on board the steamship for its safe navigation. "It is probable," says the learned judge of the court below, "that the morning was misty, but if any reliance is to be placed upon disinterested testimony, the mist did not offer any serious obstacle to vision." As corroborative of this testimony, it is observed by the learned judge, that though there were from 20 to 40 vessels on this same anchorage ground, and a passing ferryboat, no fog signals were heard from any of them. Having found, therefore, that the barge was on the anchorage ground, where she had a right to be, and that the steamship was out of her proper course at the time of the collision, a fact not excused or accounted for by any atmospheric conditions found to exist at the time, and that fog signals on the barge were not required by those conditions, and that neither such signals nor an anchor watch could have been effective to prevent the collision or mitigate its effects, the learned judge is at a loss to account for the same, except by the fault of the steamship. These findings of fact by the court below have not only the weight with us that such findings are always entitled to have, but we think they are justified by the evidence as disclosed in the record. An independent discussion of this evidence would answer no good purpose, and it suffices to refer to and approve that contained in the opinion of the court below.

The fourth assignment of error is as follows:

"The learned court erred in finding in this action, which is in personam, that the respondent was liable for the action of the pilot, who was compulsorily taken on board the ship."

The point suggested by this assignment was made in argument in the court below, as also in this court. Counsel for complainant contend that it was made compulsory, under the Pennsylvania act of 1803, to, take a licensed pilot on board, and that such a pilot having been so taken by the respondent's steamship in obedience to law, he was in no sense the servant of the owners, and they therefore would not be subject in an action in personam for his default. The point is interesting and important, and if taken in the proper manner and at the proper time, would have required careful consideration at our hands. It is a distinct and substantive defense, and as such should have been properly set forth in the answer or other plea by the respondent. Such a pleading should have stated, with due certainty and precision, the special facts constituting the defense, such as the compulsory employment of the pilot, and not only the extent of his authority on the ship at the time of the collision, but the particular default or misconduct alleged to be the cause thereof. Proof corresponding with such allegations would present a very serious question as to the liability of respondent in an action in personam, such as the one before us. In the absence of such pleading, we are not at liberty to consider the defense as suggested in argument. It is not sufficient to rely upon facts proved having a material bearing on such a defense, "unless there

are allegations suited to bring them before the court as matters of plea and controversy." The importance attached in admiralty practice to the pleadings of libel and answer, is evidenced by the fact that they are required to be sworn to, and courts are careful to enter no decree not founded upon an issue or controversy thus raised. In the present case, the only issues here raised are as to the position of the barge and the nature of the weather. The statement by way of narrative in the answer, that the steamship left her pier at a certain hour "with the assistance of two tugs, a river and sea pilot, Daniel Stevens, who was in command," and the further averment that, at the time of the collision, "Daniel Stevens, a regularly licensed pilot in charge of the ship, the master and third officer were on the bridge," are far short of the requirements in this respect. There is no affirmative allegation that the collision was caused by the fault of the pilot, and that that fault would be set up as a defense to libelant's claim, on the ground that he was compulsorily employed under the provisions of the Pennsylvania act. On the contrary, the averment is, that those on board the Bengalia were entirely free from fault, and the pilot was called as a witness to so testify. We think, therefore, the court below was entirely right in refusing to consider favorably the point made in the fourth assignment of error.

The appellant also assigns as error, that the court found that the value of the barge "Iron State," at the time of the collision, was $17,000, but failed to find that the said value was, at the time of the collision, only $9,000. After it had been ordered and adjudged by the court below, that the collision mentioned in the libel was due to fault on the part of the steamship, the case was referred to a commissioner, to ascertain the damages sustained by the libelant, and to report thereon to the court. Under this order, much testimony was taken, and much time consumed, principally by the libelant. The commissioner, in an elaborate supplemental report, after exceptions had been made and considered to his first report, fixed the value of the barge at the time of the collision, at $13,000. This being excepted to by both sides, the learned judge of the court below, after examination of the voluminous testimony presented before the commissioner, was of opinion that the valuation of the barge should be raised from $13,000 to $17,000, "and even this larger sum," he said, "seems to be a conservative estimate." After examining this testimony, we do not feel that this finding of the learned judge should be disturbed.

It is also objected, that the court below erred in allowing interest upon the award from the date of the collision, October 12, 1900, to the date of the decree, July 21, 1907. It would seem that an unusually long time was consumed after the delivery of the court's opinion as to liability, in taking the testimony of the ten witnesses examined by libelant as to the value of the barge at the time of the collision. Three years and four months are alleged to have been so occupied by the libelant, while the respondent occupied only from February 7th to May 29th, a period of 3 months and 22 days, in examining the same number of witnesses. It is, however, well settled, that the allowance of interest is a matter entirely within the discretion of the court making the decree. In this case, the court below has said:

"No circumstances were shown to render inequitable the allowance of interest on the various items of damage, and the award of the commissioner in this respect is approved. The respondent should also pay the costs of suit, including the costs of inquiry before the commissioner."

As a general rule, such an exercise of discretion is not properly the subject of review, and the decree of the court below is therefore affirmed.